UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TOWN OF OYSTER BAY,

               Plaintiff,

   v.

NORTHROP GRUMMAN SYSTEMS
CORPORATION, et al.,

               Defendant.

Case No. 2:05-cv-1945-DG-SIL

**MEMORANDUM OF LAW IN SUPPORT OF THE TOWN OF OYSTER BAY'S MOTION TO COMPEL DISCOVERY**

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ..................................................................................................... 4

    I.    Factual Background ................................................................................ 4

    II.    The *Travelers* Litigation ....................................................................... 8

    III.    Case Background .................................................................................... 9

ARGUMENT ......................................................................................................... 11

    I.    The Town Is Entitled to Discovery Supporting Its Equitable Defenses to Contribution ......................................................................... 12

        A.    Courts Equitably Allocate CERCLA Costs by Selecting the Appropriate Factors ................................................................. 12

        B.    The Town's Requested Discovery Is Relevant so that the Town Can Compare the Volume and Toxicity of Its and Grumman's Contamination ................................................................................. 13

        C.    The Town's Requested Discovery Is Relevant Because It Will Enable the Town to Assert Grumman's Disproportionate Culpability for Contaminating the Park ............................................ 16

        D.    Grumman's Objection that the "Facility" Is Irrelevant to the Park Is Unpersuasive Because Grumman Operated the Facility and the Park as One Contiguous, Connected Facility ................................ 18

        E.    Grumman's Records are Relevant Because Grumman Seeks to Recover Costs to Build and Operate a System to Remediate Contamination It Caused .......................................................... 19

        F.    The Court Should Not Prematurely Constrain Discovery on Merits Issues .................................................................................. 20

        G.    Grumman Asked the Town for Discovery Regarding Approximately 800 "Hazardous Substances" and for Purchase Records, Undermining Its Position that the Town's Requests Are Irrelevant and Disproportionate .............................................................. 21

        H.    The Town's Requests are Proportional .......................................... 22

    II.    The Town Is Entitled to the *Travelers* Documents ............................. 23

        A.    The Fact That the *Travelers* Documents Were Filed Under Seal Does Not Preclude Their Production Here Per the First Amendment and Second Circuit Law ................................................................ 23

        B.    Grumman Can Easily Produce the *Travelers* Documents ................. 24

        C.    The *Travelers* Documents Are Relevant ...................................... 25

CONCLUSION ..................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agarunova v. Stella Orton Home Care Agency, Inc.*,
No. 16-cv-0638 (MKB), 2018 WL 6173433 (E.D.N.Y. Nov. 26, 2018)...............................21

*Appvion, Inc. v. P.H. Glatfelter Co.*,
144 F. Supp. 3d 1028 (E.D. Wis. 2015).....................................................................25

*Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
No. 90-cv-7811, 1993 WL 437767 (S.D.N.Y. Oct. 26, 1993)..................................20

*Asarco LLC v. Atl. Richfield Co.*,
975 F.3d 859 (9th Cir. 2020) ...................................................................................16

*Brown v. Maxwell*,
929 F.3d 41 (2d Cir. 2019).................................................................................23, 24

*Bueno v. LR Credit 18, LLC*,
2017 WL 2712885 (E.D.N.Y. June 6, 2017) ...........................................................25

*Chevron Mining Inc. v. United States*,
609 F. Supp. 3d 1202 (D.N.M. 2022) ......................................................................16

*Conservation L. Found., Inc. v. Shell Oil Co.*,
No. 3:21-cv-00933, 2023 WL 5434760 (D. Conn. Aug. 22, 2023)..............11, 20, 21

*El Paso Nat. Gas Co., LLC v. United States*,
390 F. Supp. 3d 1025 (D. Ariz. 2019) .....................................................................17

*Exxon Mobil Corp. v. United States*,
335 F. Supp. 3d 889 (S.D. Tex. 2018) .....................................................................14

*Gilead Scis., Inc. v. Khaim*,
No. 24-cv-4259, 2025 WL 1151412 (E.D.N.Y. Apr. 21, 2025)...............................22

*Granite State Ins. Co. v. Clearwater Ins. Co.*,
No. 09-cv-10607, 2012 WL 1520851 (S.D.N.Y. Apr. 30, 2012) .............................20

*J.T. Baker, Inc. v. Aetna Cas. & Sur. Co.*,
135 F.R.D. 86 (D.N.J. 1989).............................................................................21, 25

*Lugosch v. Pyramid Co. of Onondaga*,
435 F.3d 110 (2d Cir. 2006)....................................................................................24

*MPM Silicones, LLC v. Union Carbide Corp.*,
    966 F.3d 200 (2d Cir. 2020)................................................................12, 13

*N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*,
    325 F.R.D. 36 (E.D.N.Y. 2018) ....................................................11, 20, 22

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
    596 F.3d 112 (2d Cir. 2010)...........................................................12, 13, 14

*Offor v. Mercy Med. Ctr.*,
    No. 15-cv-2219 ADS SIL, 2020 WL 8839769 (E.D.N.Y. June 11, 2020)............................11

*Olson v. Major League Baseball*,
    29 F.4th 59 (2d Cir. 2022) ....................................................................23, 24

*Ravarino v. Voya Fin., Inc.*,
    No. 3:21-cv-01658, 2025 WL 969674 (D. Conn. Mar. 31, 2025)....................20, 21

*Seneca Meadows, Inc. v. ECI Liquidating, Inc.*,
    427 F. Supp. 2d 279 (W.D.N.Y. 2006) ..................................................19

*Travelers Indem. Co. v. Northrop Grumman Corp.*,
    3 F. Supp. 3d 79 (S.D.N.Y. 2014), *aff'd*, 677 F. App'x 701 (2d Cir. 2017)...................*passim*

*Travelers Indem. Co. v. Northrop Grumman Corp.*,
    677 F. App'x 701 (2d Cir. 2017) ...........................................................9, 18

*Travelers Indem. Co. v. Northrop Grumman Corp.*,
    No. 12-cv-3040, 2014 WL 923211 (S.D.N.Y. Mar. 7, 2014), *aff'd*, 677 F.
    App'x 701 (2d Cir. 2017) ...........................................................................5

*United States v. Davis*,
    31 F. Supp. 2d 45 (D.R.I. 1998)............................................................13

*Vaigasi v. Solow Mgmt. Corp.*,
    No. 11-cv-5088, 2016 WL 616386 (S.D.N.Y. Feb. 16, 2016) ...............................22

*Yankee Gas Servs. Co. v. UGI Utilities, Inc.*,
    852 F. Supp. 2d 229 (D. Conn. 2012).......................................................*passim*

**Statutes**

42 U.S.C. § 9601(14) ....................................................................................21

42 U.S.C. § 9613(f)(1) ...........................................................................2, 12, 13

Comprehensive Environmental Response, Compensation, and Liability Act
    (CERCLA) ................................................................................................1

**Other Authorities**

40 C.F.R. § 302.4 ....................................................................................................21

EPA, CERCLA Hazardous Substances Defined (January 14, 2025), *available at*
    https://www.epa.gov/epcra/cercla-hazardous-substances-defined; .........................................21

Fed. R. Civ. P. 26(b)(1) ...........................................................................................11

Fed. R. Evid. 401 ....................................................................................................11

## <u>PRELIMINARY STATEMENT</u>

This discovery dispute arises out of Northrop Grumman Systems Corporation's (Grumman's) counterclaim against the Town of Oyster Bay (the Town) for contribution under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Grumman's counterclaim asks the Town to pay some of Grumman's costs designing, constructing, and operating groundwater and soil vapor treatment systems at the Bethpage Community Park (the Park) in Bethpage, NY.

The Park was a key part of Grumman's sprawling, 600-acre industrial campus at Bethpage. Grumman's manufacturing used millions of pounds of chemicals as solvents, as paint cleaners, and for other industrial purposes. For decades, Grumman disposed chemical sludges and other hazardous wastes on an 18-acre portion of its industrial campus, which is now the Park. Grumman heavily contaminated the future Park by pouring industrial wastewater into unlined pits Grumman dug for waste disposal, burying drums filled with toxic sludge, and setting oil pits on fire for training exercises. And then, in 1962, Grumman donated this 18-acre parcel to the Town for exclusive use as a park.

Grumman's decades of waste disposal at Bethpage contributed to a plume of contaminated groundwater that has percolated into Long Island's aquifer and is now the focus of a vast remediation effort. To mitigate the flow of contaminated groundwater from the Park, Grumman built two treatment systems: a groundwater interim remedial measure (the Groundwater IRM) and a soil gas interim remedial measure (the Soil Gas IRM). Grumman's counterclaim demands that the Town pay millions of dollars to Grumman for its costs to design, construct, and operate these systems.

After Grumman donated the Park land, the Town built an ice rink in the northeast corner of the Park. Grumman asserts that Freons, a type of refrigerant, leaked from the rink into the Park soil, were captured by Grumman's remedial systems, and materially contributed to Grumman's costs. At best for Grumman, equipment designed to remediate its own contamination incidentally treated Freon that the Town allegedly released. Grumman's counterclaim asks the Town to pay Grumman for remediating this Freon.

The Town's discovery requests at issue here seek to quantify the scope of the environmental catastrophe Grumman created to put in context the *de minimis* relevance of Freon contamination to the IRMs that Grumman constructed. Grumman built the IRMs to remediate its own contamination and will operate them for years into the future long after any Freon allegedly released by the Town has been fully remediated. In this motion, the Town seeks three categories of information that Grumman has refused to produce:

- Grumman's chemical purchase records from its manufacturing operations,

- information regarding Grumman's handling of Freons at the "Facility" (the portion of Grumman's campus from which the pollutants came), and

- documents filed under seal in a lawsuit between Grumman and its insurers concerning the Bethpage campus (including the Park) (the *Travelers* Documents).

Grumman objected to the discovery requests at issue here, arguing that the "Facility" as defined in the Town's requests is irrelevant to contamination at the Park—even though Grumman used what is now the Park as its waste disposal area for the "Facility." Grumman also objected to producing the *Travelers* Documents because, it says, they are irrelevant and were filed under seal.

In CERCLA cost allocation cases, courts equitably select factors that are relevant to the particular case. 42 U.S.C. § 9613(f)(1). For decades, courts have applied two sets of factors, the

2

Gore Factors and the Torres Factors, to conduct equitable allocation. *See*, *e.g.*, *Yankee Gas Servs. Co. v. UGI Utilities*, Inc., 852 F. Supp. 2d 229, 247 (D. Conn. 2012). In a prior stipulation, Grumman agreed to produce discovery relevant to these equitable factors. (ECF No. 190 at 2.) The Town's requested discovery is relevant to the Town's equitable defenses for the following reasons:

*First*, the Town requires its requested discovery so that its expert can estimate how much contamination Grumman released at the Park, and so that the Town can compare the volume and toxicity of Grumman's releases to its own (which are far less toxic and far less in volume). Grumman asserts that it has already produced other records that it views as sufficient to calculate the Town's share of contaminants, but the records in question are decades old and the Town is entitled to compare the accuracy and completeness of the records Grumman has produced with other categories of Grumman's business records that Grumman refuses to produce. This is especially true where, as here, Grumman's records failed to reveal dozens of drums of toxic waste that Grumman buried under the Park and which Grumman discovered by accident only last year.[1]

*Second*, the Town requires its requested discovery to make equitable arguments about Grumman's culpability for contaminating the Park. Grumman is far more culpable for its large-scale, intentional disposal than the Town is for its inadvertent release from a community ice rink.

*Third*, the Town requires discovery regarding the "Facility," not just the Park, because every contaminant now present in the Park, other than contaminants from the Town's rink, was first purchased by Grumman, delivered to Grumman's Facility, used by Grumman in a Grumman manufacturing process, collected in Grumman's waste collections systems, and then dumped by

---

[1] *See* Declaration of David Shea in Support of Town's Motion to Compel (Shea Decl.) ¶¶ 23-25, attached as Exhibit C.

3

Grumman in the Park soil. Every contaminant released to the Park came from Grumman's contiguous operations.

*Fourth*, Grumman's industrial history is relevant because Grumman seeks to recover money it spent remediating its own contamination, and which only incidentally remediated Freon. The Town needs to understand Grumman's releases to understand why Grumman built substantially bigger and more expensive remedial systems than would have been needed to clean up Freon from the Town.

*Fifth*, Grumman's discovery objections prematurely foreclose the Town and the Court from applying the relevant Gore and Torres Factors, and instead lock the Town and the Court into Grumman's predetermined allocation model.

Finally, Grumman claims the Town's requests are not proportional. But, Grumman has issued requests seeking similar information, and, in any event, the Town's requests are proportional because they address fundamental issues in the Town's case. Grumman's objections to producing the *Travelers* Documents are particularly meritless. As the Court observed at oral argument on this motion, Grumman can easily produce the *Travelers* Documents. They are also relevant because they speak to how Grumman's historical activity contaminated the Park and any judicial admissions Grumman may have made regarding its contamination.

## BACKGROUND

### I.    Factual Background

Beginning in the 1930s, Grumman manufactured airplanes at a 600-acre parcel in Bethpage, New York. (*Travelers Indem. Co. v. Northrop Grumman Corp.*, 3 F. Supp. 3d 79, 84 (S.D.N.Y. 2014), *aff'd*, 677 F. App'x 701 (2d Cir. 2017), attached as Exhibit A.) This facility included Grumman-owned plants, the Bethpage Naval Weapons Industrial Reserve Plant (NWIRP), which the U.S. Navy owned and which Grumman operated, and the land that became

4

the Park. (*Id.*) In the present discovery dispute, the Town defined the "Facility" as essentially Grumman's manufacturing plant other than the land that became the Park. (*See* ECF Nos. 194-3, 194-4, 194-5, 194-6.) The Court should understand, however, that when Grumman was conducting the manufacturing at issue here, Grumman operated the whole parcel as one facility, in the ordinary sense of the word. Grumman was the sole user of the land and sole party disposing waste at what is now the Park. (Shea Decl. ¶ 8.)

Grumman used and disposed numerous chemicals that have become contaminants of environmental concern at the Park, including trichloroethylene (TCE), other solvents, polychlorinated biphenyls (PCBs), and several metals, including chromium and cadmium. (Exh. A at 85–87.) Grumman's counterclaim, and the Town's motion to compel, focus only on volatile organic compounds (VOCs), a category that includes TCE, other chemicals used as solvents in industrial applications, and Freons.[2] (*See* ECF No. 190 at 1-2.)

Grumman used TCE in several of its plants to degrease metal parts and to clean paint equipment. (Exh. A at 84–85.) TCE is toxic if inhaled, touched, or ingested. (*Id.* at 84.) Beginning in the 1940s, Grumman dug unlined disposal pits directly into the ground of what became the Park. (*Travelers Indem. Co. v. Northrop Grumman Corp.*, No. 12-cv-3040, 2014 WL 923211, at *1 (S.D.N.Y. Mar. 7, 2014), *aff'd*, 677 F. App'x 701 (2d Cir. 2017), attached as Exhibit B.) Grumman dumped several types of wastes containing TCE and other solvents at the Park, including industrial wastewater, sludge, waste oils, used rags, and solid waste that settled at the bottom of its wastewater tanks. (*Id.*) When the percolating wastewater created an impermeable layer of sludge at the bottom of its earthen pits, Grumman scraped out the sludge, buried it, and poured in new

---

[2] There are several different types of Freon molecules. Grumman alleges that the Town's ice rink released Freon 12 and Freon 22.

wastewater. (Exh. A at 86.) Grumman also used the Park as a fire-training area, dumping waste oil into pits and igniting the oil approximately three times per year. (Exh. B at *1.)

The Town believes that Grumman used truly massive quantities of VOCs at Bethpage. While the Town lacks information regarding the relevant pre-Park period (hence its request for purchase records), the Town can infer that the Grumman used enormous amounts of VOCs based on later data from the Environmental Protection Agency's (EPA's) Toxics Release Inventory (TRI). (Shea Decl. ¶ 9.) In 1987, the first year that TRI data is available, Grumman disposed of more than 400,000 pounds of VOCs off-site and released nearly 1.8 million pounds of VOCs into the atmosphere. (*Id.* ¶ 10.) The Town seeks purchase records from Grumman because these figures imply that Grumman used millions, not hundreds or thousands, of pounds of VOCs each year, both in the 1980s and from approximately 1949-1962 when Grumman was disposing industrial waste at the Park. (*Id.* ¶¶ 6, 10-11.) These quantities dwarf the amount of VOCs recovered at the Park—roughly 3,000 pounds. (*Id.* ¶ 21.) Thus, the Town is concerned that large quantities of VOCs remain at the Park, that existing data from Grumman's IRMs is inadequate, and that existing data grossly understates Grumman's use of the Park as a disposal site for vast quantities of chemical wastes.

In 1962, Grumman donated 18 acres of its parcel to the Town, on the express condition that the Town use the land as a public park. (*Id.* at ¶ 6.) The Town undertook significant construction to transform the former industrial waste dump into land fit for use as a park, including constructing an ice rink. (*Id.* ¶ 7.) Grumman alleges that Freons from the rink leaked into the Park's soil.

The Town renovated and reconstructed the ice rink in the mid-2000s. As part of that work, the Town signed a consent order with the New York State Department of Environmental Conservation (DEC) to investigate and remediate the seven-acre area around the rink. The Town

expended more than $20 million investigating and remediating the rink area—this expense formed the basis of the Town's contribution claim in this case. (ECF No. 22 ¶ 72.)

Grumman seeks contribution for the costs of the Groundwater and Soil Gas IRMs it built along the southern boundary of the Park. These systems were designed to stem the southward flow of contaminated groundwater from the Park into Long Island's aquifer. (*Id.* ¶¶ 14-15.) Grumman's historic operations are the overwhelming source of this contamination, which threatens Long Island's drinking water. (*Id.*) Grumman's Soil Gas and Groundwater IRMs began operating in 2008 and 2009, respectively, and were designed and built to operate for decades to come. (*Id.* ¶¶ 17-18.)

The Groundwater IRM works by intercepting the flow of contaminated water. (*Id.* ¶ 16.) It pumps groundwater to the surface, treats it through a filtration system, and pumps the treated water back into the ground. (*Id.*) The Soil Gas IRM works by suctioning VOC vapors out of the soil and capturing them through a filtration system. (*Id.* ¶ 17.) Both IRMs were designed to remediate "Project VOCs"—contaminants for which Grumman is responsible. (*Id.* ¶ 18.) The systems also incidentally capture "Non-Project VOCs"—other contaminants for which Grumman disclaims responsibility. (*Id.*) These Non-Project VOCs include Freons and other chemicals.

The Groundwater and Soil Gas IRMs have removed enough Freon 12 and 22 that no further remediation of these substances is required. (*Id.* ¶ 19.) Since 2017, the Groundwater IRM has not detected the presence of Freon 12 or 22 in the groundwater and the Soil Gas IRM has detected no Freon 12 and only trace amounts of Freon 22. (*Id.*) The Groundwater and Soil Gas IRMs continue to collect Project VOCs with no known end date. (*Id.* ¶ 22.) The disproportionately quick collection of Freons is likely due to the Freons' chemical properties. Because Freons are a gas at ambient temperature, it is easier to flush them out of soil through percolating groundwater or vacuum pressure than it is to remove other VOCs. (*Id.* ¶ 20.) The key conclusion here is that for the past

7

eight years, and into the indefinite future, the two IRMs for which Grumman seeks cost recovery have collected only contaminants for which Grumman is responsible.

In 2024, Grumman re-discovered twenty-two drums containing toxic waste that it buried under the Park and had forgotten. (*Id.* ¶ 23.) The buried drums contained liquid waste and a neon-yellow hardened sludge, which was also found in the soil surrounding the drums. (*Id.* ¶ 24.) Testing of drum contents revealed the presence of TCE, acetone, methylene chloride, toluene, and xylenes, among numerous other VOCs. (*Id.* ¶ 25. ) The drum contents demonstrate another pathway that Grumman's VOCs contaminated the Park and provide additional evidence that Grumman's waste sludge contained the VOCs at issue in this case. The discovery of drums that Grumman forgot about and had not previously found is another reason the Town requires records to independently verify Grumman's industrial activity.

## II.    The *Travelers* Litigation

In 2012, Travelers Indemnity Co. (Travelers) and Century Indemnity Co. (Century), brought a declaratory judgment action against Grumman, asserting that they did not owe Grumman coverage for its Bethpage environmental liabilities under a series of insurance policies issued from 1950-1986. (Exh. A at 83.) The two insurers moved for summary judgment in a series of motions addressing, respectively, the Bethpage Community Park, the Bethpage Facility (manufacturing portion of Grumman's campus), and claims against Grumman by various water districts. In response to these motions, Grumman prepared responses to the insurers' Statements of Undisputed Material Fact, citing a variety of sealed documents. (*See* Exh. A. at 84, Exh. B at *2-3 (citing declarations and deposition transcripts).) Information used in the *Travelers* case is both a subject of the parties' present discovery dispute and a key source of information about Grumman's historic manufacturing operations.

The insurers' summary judgment motions depended, in part, on the application of the pollution exclusions in the insurance policies. These exclusions foreclosed coverage unless Grumman's release of pollutants was "sudden or accidental" or not "expected or intended." (Exh. A at 97.) The *Travelers* court held that Grumman's disposal of TCE and other contaminants was intentional, not accidental as to both the Bethpage Facility and the Park. (Exh. A at 111, Exh. B at *6.) The court observed, "Grumman knew what it was doing with respect to its operations as set forth extensively in the fact section above. It intended to use TCE in its spray guns, and it intended for sludge containing TCE to be sent to the recharge basins, [and] for the water containing TCE to be wiped up with rags." (Exh. A at 106.) The court also determined, "Grumman's own words [make] it clear that its disposal practices in [the Park] were planned and spanned a number of years." (Exh. B at *6.) The Court granted summary judgment for the insurers, and the Second Circuit affirmed. *Travelers Indem. Co. v. Northrop Grumman Corp.*, 677 F. App'x 701, 703 (2d Cir. 2017).

## III.    Case Background

The Town filed this case in 2005. In 2006, Grumman answered and pleaded its counterclaim for contribution under CERCLA. (ECF No. 31 at 24.) The Court granted summary judgment against the Town's claims in 2009. (ECF No. 94.) Grumman's counterclaim is the only remaining claim before the Court.

The parties stipulated to the scope of Grumman's counterclaim and discovery in this case. Grumman agreed to limit its counterclaim to its costs "investigating, designing, constructing, and/or operating" the Soil Gas and Groundwater IRMs to remediate Freons released from the Town's ice rink. (ECF No. 190 at 1–2.) The parties agreed to discovery of "documents and information relevant to the equitable factors a Court will apply when assessing the past and future Response Costs claimed by Northrop Grumman," including waste disposal activities, investigation

9

of Project and Non-Project VOCs, and Town management of its ice rink (*Id.* at 2–3.) The Court approved the stipulation. (*Id.* at 3.)

The parties also stipulated to a protective order covering confidential information. Pursuant to this order, produced documents marked confidential may be used only in this case, and may not be disclosed to any person excepted as provided in the order. (ECF No. 193 at 1.) The parties expressly contemplated that they would produce documents, like the *Travelers* Documents, filed under seal in another case; they agreed that these documents are presumptively confidential. (*Id.*) The Court approved this stipulation as well. (*Id.* at 4.)

On December 27, 2024, the Town wrote to Grumman to address deficiencies in Grumman's production of documents and interrogatory answers (ECF No. 194-1). The Town explained that it is entitled to documents and interrogatory answers regarding Grumman's manufacturing operations at the Facility and the supplies Grumman purchased, so that the Town can develop its defenses to contribution. (*Id.*) The Town also served its Third Request for Production of Documents, seeking papers filed under seal in the *Travelers* case supporting or opposing summary judgment. (ECF No. 194-6.) The briefs, statements of fact, and exhibits supporting or opposing summary judgment are sealed in *Travelers*.

Grumman refused to produce the documents the Town requested in its letter and Third Request for Production. (ECF Nos. 194-2, 194-10.) On February 20, 2025, the parties met and conferred. Following that conversation and to facilitate compromise, the Town emailed Grumman's counsel a tailored request for Grumman's Responses to Travelers' Statement of Undisputed Material Fact Pursuant to Local Rule 56.1 in support of Travelers' motions for summary judgment regarding the Bethpage Facility and Bethpage Community Park, so that the

Town could identify specific relevant briefs, statements of fact, and exhibits. Grumman refused to produce even these two documents so that the Town could tailor its requests further.

On March 14, the Town moved to compel Grumman to produce documents responsive to its Requests for Production Nos. 2, 5, 6, 14, 15, 17, 18, 26, 27, and 33–38, and to answer Interrogatories Nos. 2, 4, 6, 7, 9, and 10. (ECF No. 194 at 2.) The Court heard oral argument on the Town's motion on April 22, 2025, and ordered supplemental briefing.

## ARGUMENT

Courts grant motions to compel when the moving party has established that the discovery sought is sufficiently relevant and proportional. *Offor v. Mercy Med. Ctr.*, No. 15-cv-2219 ADS SIL, 2020 WL 8839769, at *1 (E.D.N.Y. June 11, 2020). Information is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. At the discovery stage, relevance is "an extremely broad concept." *Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21-cv-00933, 2023 WL 5434760, at *10 (D. Conn. Aug. 22, 2023). Courts assess proportionality by considering "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

While the moving party must show that the information it seeks is relevant, upon such a showing, "it is up to the responding party to justify curtailing discovery." *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 48 (E.D.N.Y. 2018). The objecting party must "show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each request or question is overly broad, unduly burdensome or oppressive." *Id.*

# I.    The Town Is Entitled to Discovery Supporting Its Equitable Defenses to Contribution

Essentially, the Town seeks three categories of discovery: (i) purchase records of the chemicals Grumman used in its manufacturing operations,[3] (ii) information about Grumman's handling of Freons at the Facility,[4] and (iii) documents filed in the *Travelers* case.[5] All of these areas are relevant to the Town's defenses to contribution. The Town seeks purchase records to establish how much of each chemical Grumman purchased and therefore approximately how much it disposed at the Park. The Town seeks information about Grumman's Freon use at the Facility to determine whether Grumman is responsible for Freons found at the Park. The Town seeks the *Travelers* Documents to better understand Grumman's historic operations so that it can assess how much VOC contamination Grumman released at the Park. These three categories of documents also speak to Grumman's level of involvement in, and culpability for, polluting the Park. Truncating discovery now would foreclose the Town from developing expert testimony and prematurely constrain the Court's consideration of the relevant allocation factors.

## A.    Courts Equitably Allocate CERCLA Costs by Selecting the Appropriate Factors

Courts decide CERCLA cost allocation by selecting relevant equitable factors and their appropriate weight in each case. *MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200, 236 (2d Cir. 2020). Congress "empowered the court through § 113 to use 'such equitable factors *as the court determines* are appropriate' to reach a just result." *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 130 (2d Cir. 2010) (quoting 42 U.S.C. § 9613(f)(1)). Grumman agreed

---

[3] Requests for Production Nos. 2, 5, and 6.
[4] Requests for Production Nos. 14, 15, 17, 18, and 27 and Interrogatories Nos. 2, 4, 6, 7, and 9.
[5] Requests for Production Nos. 33–38.

to discovery of "documents and information relevant to the equitable factors a Court will apply." (ECF No. 190 at 2.)

For decades, courts have applied two sets of equitable factors: the Gore Factors and the Torres Factors. *See*, *e.g.*, *MPM Silicones*, 966 F.3d at 236 n.53; *Niagara Mohawk*, 596 F.3d at 130 (listing Gore Factors); *Yankee Gas*, 852 F. Supp. 2d at 247 (collecting cases); *United States v. Davis*, 31 F. Supp. 2d 45, 63 (D.R.I. 1998) (enumerating Torres Factors). The Gore Factors are:

1. The ability of the party to demonstrate that his contribution to the release can be distinguished;
2. The amount of hazardous substance involved. Of course, a small quantity of highly toxic material, or above which releases or makes more dangerous another hazardous substance, would be a significant factor;
3. The degree of toxicity of the hazardous substance involved;
4. The degree of involvement of the person in the manufacture, treatment, transport, or disposal of the hazardous substance; and
5. The degree of cooperation between the person and the Federal, State, or local government in preventing harm to public health or the environment from occurring from a release. This includes efforts to mitigate damage after a release occurs.

*Niagara Mohawk*, 596 F.3d at 130. The Torres Factors are:

1. The extent to which cleanup costs are attributable to wastes for which a party is responsible.
2. The party's level of culpability.
3. The degree to which the party benefitted from disposal of the waste.
4. The party's ability to pay its share of the cost.

*Davis*, 31 F. Supp. 2d at 63.

This Court is entitled to select the factors that it finds persuasive and relevant. 42 U.S.C. § 9613(f)(1) ("[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."). The Town's three categories of requested discovery are relevant to several Gore and Torres Factors.

### B. The Town's Requested Discovery Is Relevant so that the Town Can Compare the Volume and Toxicity of Its and Grumman's Contamination

13

CERCLA cost allocation often compares the amount and toxicity of the contaminants each party released.[6] *See*, *e.g.*, *Niagara Mohawk*, 596 F.3d at 133 (approving of comparative quantity of pollutants as an equitable factor); *Yankee Gas*, 852 F. Supp. 2d at 248 (considering each party's releases at a former manufactured gas plant). The Town's requested discovery is relevant so that the Town can compare the quantity and toxicity of Grumman's releases to the Town's.

The Town is entitled to Grumman's purchase records, records of Freon use at the Facility, and *Travelers* filings so that the Town's expert can estimate the quantity of VOCs Grumman released at the Park and so the Town can offer its method of quantitative division at trial. The Town's approach—calculating each party's contribution of contaminants to the site—is a standard allocation factor in CERCLA cases. *See Niagara Mohawk*, 596 F.3 at 133 ("[w]hether the amount of hazardous materials deposited is minimal is an equitable consideration the court may note during the apportionment of costs."); *Yankee Gas*, 852 F. Supp. 2d at 253; *Exxon Mobil Corp. v. United States*, 335 F. Supp. 3d 889, 942 (S.D. Tex. 2018) ("The court will apply a production-based approach using 'throughputs'−the amounts of oil and rubber each facility produced−to approximate the amount of hazardous waste generated in a given period."). Grumman has not cited any authority where a court denied discovery about the primary contaminant driving the remediation of a CERCLA site—here, Grumman's VOCs.

The Town requires discovery both to support its own quantitative allocation and to rebut Grumman's numerical division. Grumman would divide the amount of Freon 12 and 22 its systems have captured by the total VOCs its systems have captured, and thus create a percentage allocation

---

[6] *See* Gore Factors 1-3 and Torres Factor No. 1.

to the Town.[7] (*See* ECF No. 195 at 3.) This method is unreasonable, because no further Freon 12 or 22 remediation has been required since 2017. (Shea Decl. ¶ 19.) By contrast, Grumman's systems will continue to remediate an unknown quantity of Grumman's contaminants for years if not decades to come. (*Id.* ¶ 22.) Thus, the present ratio of contaminants captured is a misleading metric. On the merits, if the Court were to adopt Grumman's division it would skew responsibility unfairly towards the Town. At the discovery stage, the Court should allow the discovery the Town needs to advance a quantitative theory to compete with Grumman's factually unreasonable one.

Moreover, Grumman's chemical purchase records and information regarding Grumman's Freon use at the Facility enable the Town to contest liability for the "Non-Project" VOCs—chemicals for which Grumman denies responsibility. While Grumman concedes that Project VOCs are "related to NG's operations," it maintains that Non-Project VOCs are "unrelated to NG's former activities." (ECF No. 195 at 2.) Grumman's purchase and operational records will enable the Town to contest responsibility for many Non-Project VOCs, and Grumman has agreed to discovery into the investigation of Non-Project VOCs. (ECF No. 190 at 2.) Documents that allow a party to refute responsibility for specific contaminants are relevant in a CERCLA case. *See Yankee Gas*, 852 F. Supp. 2d at 249–50 (evaluating parties' conflicting accounts of responsibility for spilled oil). The Town is entitled to discovery to support this argument.

The total volume of Grumman's releases is also crucial to Gore Factor No. 3, the degree of toxicity, because Freons allegedly released from the Town's rink are far less toxic than the

---

[7] In mathematical terms, Grumman would use the amount of Freon 12 and 22 captured as the numerator and the total VOCs captured as the denominator. The Town believes a more appropriate division would be the Town's volume of Freon releases as the numerator, and Grumman's volume of VOC releases as the denominator. The Town needs discovery to estimate the denominator in its proposed ratio.

15

chlorinated solvents Grumman disposed at the Park. (Shea Decl. ¶ 12.) With Grumman's purchase records, the Town can estimate each party's total contribution of toxicity to the Park, considering the quantity and toxicity of each substance released. Each party's share of the total toxicity is relevant to equitable allocation. *See Asarco LLC v. Atl. Richfield Co.*, 975 F.3d 859, 870 (9th Cir. 2020) (affirming trial court's consideration, to the extent evidence was available, of manner of parties' historic operations, the quantity of pollutants produced, and the toxicity of the contaminants released.)

The Town understands Grumman's argument that the Town's quantitative approach will create an imperfect estimate, because Grumman may have disposed some of its VOC-laden Bethpage waste off-site. At the merits stage, the Court can decide whether it believes Grumman's quantitative method is more reliable than the Town's analysis based on Grumman's purchase records. *See Yankee Gas*, 852 F. Supp. 2d at 249–50 (weighing each party's proposed quantitative division based on each party's expert's testimony). At the discovery stage, the Court should not foreclose the Town's ability to offer evidence addressing the quantity of VOCs at the Park.

### C. The Town's Requested Discovery Is Relevant Because It Will Enable the Town to Assert Grumman's Disproportionate Culpability for Contaminating the Park

Courts allocating CERCLA costs consider culpability. *See Chevron Mining Inc. v. United States*, 609 F. Supp. 3d 1202, 1220 (D.N.M. 2022) (allocating costs based on parties' "notice of, knowledge of, and acquiescence in the activities that cause the contamination," their degree of involvement in waste generation, their level of direct oversight over wastes, and the benefit received from their activities.) The Town's requested discovery focuses on Grumman's degree of involvement, cooperation with regulators, culpability, degree of benefit, and ability to pay. Grumman agreed to produce discovery relevant to these equitable factors. (ECF No. 190 at 2.) The Town addresses each topic in turn.

*Gore Factor No. 4 (degree of involvement):* The Town seeks information documenting the manner and amount in which Grumman intentionally buried VOC-laden waste in Park soil. Grumman is the primary party responsible for contaminating the Park, and the Town is entitled to information detailing its environmental practices. *See El Paso Nat. Gas Co., LLC v. United States,* 390 F. Supp. 3d 1025, 1053 (D. Ariz. 2019) (allocating lion's share of responsibility to "the primary party responsible for the generation and disposal of waste at the sites.").

*Gore Factor No. 5 (cooperation with regulators):* Certain of the Town's requests addressed in this motion address Grumman's cooperation with regulators. For instance, Interrogatory No. 7 asks Grumman to identify government officials with whom it communicated regarding Freons at the Park or Facility. (ECF No. 194-3 at 7.) Request for Production No. 27 asks for documents related to any violation notices from regulators regarding Freon at the Facility or the Park. (ECF N0. 194-5 at 8.) Grumman objected to both requests to the extent they encompass the Facility. (ECF Nos. 194-7 at 14, 194-9 at 17.) However, these requests are germane as to the Facility because Grumman operated what is now the Facility and the Park as one contiguous plant.

*Torres Factor No. 2 (culpability):* Grumman's operational records are critical to the Town's equitable arguments based on Grumman's intentional dumping. The *Travelers* Documents are particularly relevant, because they address whether Grumman's dumping was intended or accidental. (*See* Exh. A at 111, Exh. B at *6.) Based on the public summary judgment opinions, the Town believes the *Travelers* Documents contain detailed information about Grumman's practices, degree of care, and state of mind. These documents are relevant because they support the Town's argument for a downward adjustment in its share due to Grumman's culpability.

*Torres Factor No. 3 (level of benefit):* Courts have observed that the scale of an industrial company's production corresponds both to the amount of its pollution and the benefit it derived

from polluting. *Yankee Gas*, 852 F. Supp. 2d at 253. The Town seeks Grumman's purchase records and operational information so that it can quantify Grumman's production and thus Grumman's benefit from contaminating the Park. For example, with a sense of the scale of Grumman's operations, the Town's expert could estimate how much money Grumman saved by dumping its VOC-laden waste at the Park instead of shipping it to a proper disposal facility.

*Torres Factor No. 4 (ability to pay):* Understanding Grumman's profit from its Bethpage dumping also empowers the Town to make equitable arguments about Grumman's ability to pay.

### D. Grumman's Objection that the "Facility" Is Irrelevant to the Park Is Unpersuasive Because Grumman Operated the Facility and the Park as One Contiguous, Connected Facility

Grumman objected to the discovery requests at issue here, arguing that the "Facility" as defined in the Town's requests is irrelevant to contamination at the Park. (*See* ECF Nos. 194-7, 194-8, 194-9, 194-10.) To the contrary, every contaminant now present in the Park, other than contaminants from the Town's rink, was first purchased by Grumman, delivered to Grumman's Facility, used by Grumman in a manufacturing process, collected in Grumman's waste collections systems, and then dumped by Grumman in the Park soil. The Park was Grumman's exclusive landfill, and every contaminant Grumman placed in the landfill came from the Facility.

Although the Facility and the Park have been separate parcels since Grumman donated the Park land in 1962, during the relevant period they were one facility, in the ordinary sense of the word. *Travelers*, 677 F. App'x at 703 ("[w]ithin the original boundaries of the Facility is an 18-acre parcel now constituting the Bethpage Community Park"). Among other activities, Grumman poured wastewater into basins in the Park, scraped the bottoms and buried that sediment, buried drums full of toxic waste, and poured used oil into pits and set the oil on fire. (Exh. A at 86; Exh. B at *1; Shea Decl. ¶ 8.) Grumman is incorrect that its manufacturing plant is irrelevant to VOC contamination at the Park.

18

**E.  Grumman's Records are Relevant Because Grumman Seeks to Recover Costs to Build and Operate a System to Remediate Contamination It Caused**

Materials documenting Grumman's operations and chemical purchases are relevant for another reason: they show *why* Grumman spent the money it seeks to recover from the Town. The Town anticipates arguing at trial that Grumman built bigger, more expensive, longer-lasting systems to remediate the contamination it caused than would have been necessary if the only contaminants at the Park were Freons 12 and 22. Therefore, it is inequitable to ask the Town to pay for systems that are, from the perspective of remediating only Freons 12 and 22, overbuilt and excessive. *See Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, 427 F. Supp. 2d 279, 306 (W.D.N.Y. 2006) (allocating no costs to party that was not responsible for TCE contamination where "the presence of TCE is what necessitates the ground water monitoring").

Grumman's Groundwater and Soil Gas IRMs were designed to stem the flow of contaminated groundwater from the Park into Long Island's aquifer. (Shea Decl. ¶¶ 16-17.) The New York DEC found that the primary contaminant necessitating Grumman's IRMs is TCE and other chemicals Grumman released. (*Id.* ¶ 15.) Even though Grumman's actions created the need for the remedial systems for which Grumman seeks contribution, Grumman insists that only the Town's releases are relevant in discovery.

The information the Town seeks will support its argument that Grumman's systems are larger, longer lasting, and more expensive than needed to remediate only Freons 12 and 22. For example, Grumman's systems completed Freon 12 and 22 remediation in 2017. (*Id.* ¶ 19.) If the ice rink leak were the only issue at the Park, the remediation would have been complete eight years ago. (*Id.*) Instead, Grumman's systems may operate for years or decades to come. (*Id.* ¶ 22.) The Town wants to understand the scope of Grumman's releases so that it can estimate how much

longer Grumman's systems will continue operating and estimate the lifespan of the equipment Grumman demands the Town pay for.

Grumman's position is that the Town cannot inquire into Grumman's operations or seek seeks purchase records for chemicals "unrelated to the cost recovery claim." (ECF No. 195 at 3). However, the chemicals driving the remediation are relevant, because Grumman asks the Town to pay for a remediation spurred into being by Grumman's contamination. Grumman would hide evidence concerning its industrial operations, despite those operations causing nearly every dollar of expense for which Grumman seeks reimbursement. This is overly restrictive on its face. The Town is entitled to operational records to demonstrate that asking it to pay for Grumman's intentional, industrial-scale pollution is inequitable.

### F.   The Court Should Not Prematurely Constrain Discovery on Merits Issues

Grumman is attempting to foreclose the Town's substantive arguments through discovery objections. However, a discovery motion is not the proper forum to decide the merits of a claim or defense. *Jewish Health Sys.*, 325 F.R.D. at 48; *Conservation L. Found.*, 2023 WL 5434760, at *18; *Granite State Ins. Co. v. Clearwater Ins. Co.*, No. 09-cv-10607, 2012 WL 1520851, at *3 (S.D.N.Y. Apr. 30, 2012). If a party "desires to contest the legitimacy of its opponent's claim, it should do so with the appropriate motion." *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 90-cv-7811, 1993 WL 437767, at *3 (S.D.N.Y. Oct. 26, 1993); *Jewish Health Sys.*, 325 F.R.D. at 48; *Granite State Ins.*, 2012 WL 1520851 at *3. Discovery objections are not an appropriate method. *Ravarino v. Voya Fin., Inc.*, No. 3:21-cv-01658, 2025 WL 969674, at *7 (D. Conn. Mar. 31, 2025) ("[i]t is well established that discovery ordinarily should not be denied because it relates to a claim or defense that is being challenged as insufficient.").

Grumman's attempt to constrain the Town's arguments through discovery objections is improper. Grumman wrongly argues that because it has produced the documents needed for its

case, it need not produce any others. (ECF No. 194-2 at 4.) But if this argument were correct, "[a] defendant in an intersection accident, for example, could simply file an affidavit claiming, 'I had the green light,' and then resist all discovery into who had the right of way as 'disproportionate.'" *Ravarino*, 2025 WL 969674 at *7. A producing party may not unilaterally "dictate the scope of discovery based on [its] own views of the parties' respective theories of the case." *Conservation L. Found.*, 2023 WL 5434760, at *18. Litigants do not lose their right to discovery "just because their adversary thinks it has a compelling defense." *Ravarino*, 2025 WL 969674, at *7. The Court should not preclude discovery on the Town's claims that have yet to be substantively resolved. *See Agarunova v. Stella Orton Home Care Agency, Inc.*, No. 16-cv-0638 (MKB), 2018 WL 6173433, at *2 (E.D.N.Y. Nov. 26, 2018); *J.T. Baker, Inc. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 86, 92 (D.N.J. 1989) (denying discovery "would be tantamount to granting [a party] partial summary judgment.")

### G. Grumman Asked the Town for Discovery Regarding Approximately 800 "Hazardous Substances" and for Purchase Records, Undermining Its Position that the Town's Requests Are Irrelevant and Disproportionate

Grumman has not limited its discovery requests in this case to the narrow strictures it would impose on the Town. In its Supplemental Requests for Production of Documents, Interrogatories, and Requests for Admission, served June 13, 2024 (attached as Exhibit D), Grumman defined "Hazardous Substance" using the CERCLA definition at 42 U.S.C. § 9601(14). According to the EPA, that definition encompasses roughly 800 substances.[8] Grumman's Interrogatory No. 2 asked the Town to "[i]dentify and describe the Town's purchase, storage, handling, distribution, mixing, processing, transportation, and use of Hazardous Substances at the Site" since 1962. (Exh. D at 11-12.) Request for Production No. 12 asked the Town to produce documents and communications

---

[8] (EPA, CERCLA Hazardous Substances Defined (January 14, 2025), *available at* https://www.epa.gov/epcra/cercla-hazardous-substances-defined; *see also* 40 C.F.R. § 302.4 (listing substances).)

concerning the Town's "purchase, storage, handling, distribution, mixing, processing, transportation, and use of chemicals that are [VOCs], any and all chlorinated solvents, solvents, oils and petroleum products." (*Id.* at 15.) In addition to these purchase records requests, Grumman also asked for documents concerning the Town's purchase of refrigerants and cooling systems. (*Id.* at 8–9.) Accordingly, Grumman's discovery requests in this case undermine its argument that the Town's analogous requests are irrelevant and disproportionate.

### H.  The Town's Requests are Proportional

"Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Jewish Health Sys.*, 325 F.R.D. at 49. Frequently, proportionality "turns on how 'central' (or relevant) the proposed discovery may be to overcome any number of objections that are associated with the discovery at issue." *Vaigasi v. Solow Mgmt. Corp.*, No. 11-cv-5088, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016). Because the Town has made a *prima facie* showing that its requested discovery is relevant, Grumman now bears the burden to demonstrate that the Town's requests are disproportionate. *Jewish Health Sys.*, 325 F.R.D. at 48.

The Town's three categories of requested discovery are proportional. The Town's requests for purchase records are proportional because they address a fundamental issue in the case: how much of the Park's VOC contamination are Grumman and the Town responsible for? As discussed, attributing the quantity of chemicals for which each party is responsible is a fundamental aspect of CERCLA allocation. Although there may be some burden producing these documents, any burden is not disproportionate because the documents speak to a central issue in dispute. *See*, *e.g.*, *Gilead Scis., Inc. v. Khaim*, No. 24-cv-4259, 2025 WL 1151412, at *8 (E.D.N.Y. Apr. 21, 2025) (compelling discovery where documents "bear[] on [plaintiff's] claims in the instant suit.")

The Town's requests regarding Grumman's Freon use at the Facility are proportional because they address another key issue: which party is responsible for Non-Project VOCs remediated by Grumman's systems? Grumman's refusal to produce information regarding the Facility, not just the Park, deprives the Town of its opportunity to disclaim responsibility for these contaminants and to make equitable arguments about Grumman's involvement in contaminating the Park. This category also pertains to core issues and is thus proportional.

Last, the *Travelers* Documents are proportional, because, as discussed below, there is little burden to produce them and they are highly relevant.

## II.    The Town Is Entitled to the *Travelers* Documents

### A.  The Fact That the *Travelers* Documents Were Filed Under Seal Does Not Preclude Their Production Here Per the First Amendment and Second Circuit Law

Grumman's objection that the *Travelers* Documents were filed under seal in that case and therefore cannot be produced in this one is unpersuasive because the *Travelers* Documents are accessible public records under the First Amendment and Second Circuit law. Independent of discovery here, the Town intends to petition the *Travelers* court to lift the sealing order and release the *Travelers* Documents. The Town provides only a brief overview of Second Circuit law here.

The Second Circuit establishes a three-step common law framework to determine when court documents should be unsealed. First, the reviewing court must determine whether the document is a "judicial document" to which the interest in public disclosure attaches. *Olson v. Major League Baseball*, 29 F.4th 59, 87 (2d Cir. 2022). Summary judgment documents are, as a matter of law, judicial documents and presumptively open to the public. *Brown v. Maxwell*, 929 F.3d 41, 47 (2d Cir. 2019).

Second, the court must determine what weight to give the presumption in favor of disclosure. *Olson*, 29 F.4th at 87. "[D]ocuments used by parties moving for, or opposing, summary

23

judgment should not remain under seal *absent the most compelling reasons.*" *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 123 (2d Cir. 2006) (emphasis added).

Last, the court balances the presumption against competing considerations. *Olson*, 29 F.4th at 88. Where the presumption is at its strongest, it can be overcome only in extraordinary circumstances. *Id*. at 93.

Under the First Amendment, the Second Circuit considers whether the documents are of the kind traditionally open to the public or a necessary corollary to the right to attend court proceedings. *Lugosch*, 435 F.3d at 120. Once a court concludes that a First Amendment access right exists, documents may remain sealed only if "'higher values' in the First Amendment framework so demand" and the sealing order is narrowly tailored to achieve those values. *Id.* at 124. When the presumption for access has not been overcome, the Second Circuit has acted decisively; in *Brown* it ordered summary judgment materials unsealed immediately without waiting for remand. 929 F.3d at 44–45.

Here, the Town has requested documents in support or opposition to summary judgment, which are presumptively accessible. *Brown*, 929 F.3d at 47. Although Grumman may assert that it is bound by the sealing order in the *Travelers* case, the First Amendment and common law overcome any sealing consideration here. In fact, the parties expressly contemplated that they would produce documents filed under seal in other cases: the parties' protective order states, "[i]t is agreed that materials produced in this litigation that had previously been produced in other litigation under a protective order or under seal shall be designated Confidential." (ECF No. 193 at 1.) Grumman's argument that the *Travelers* Documents cannot be produced is unavailing.

### B. Grumman Can Easily Produce the *Travelers* Documents

The Court observed at oral argument that producing the *Travelers* Document is a minimal burden to Grumman, because the *Travelers* Documents have already been produced or filed. Thus, the Court focused on the relevance portion of the discovery inquiry.

### C. The *Travelers* Documents Are Relevant

The *Travelers* Documents speak to several issues, including: how and in what quantity Grumman created VOC contamination at the Park, how much contamination remains to be remediated, Grumman's involvement in intentional dumping, and any admissions Grumman has made on these topics. Grumman's objection that some aspects of the *Travelers* Documents touch on irrelevant issues is immaterial.[9] *Appvion, Inc. v. P.H. Glatfelter Co.*, 144 F. Supp. 3d 1028, 1032 (E.D. Wis. 2015) ("some aspects of [plaintiff's arbitration with another party] could very well be irrelevant to the issues remaining in this case. But that does not mean Appvion can sustain a blanket objection to turning over all responsive documents."); *J.T. Baker*, 135 F.R.D. at 92 (recognizing that interrogatories regarding insured's intent in polluting environment may also be relevant to other issues.) The Town has shown the multiple ways that the *Travelers* Documents are relevant, and the Court has noted that the burden to produce them is minimal. The Court should require Grumman to produce them.

## CONCLUSION

For these reasons and for other reasons as may be apparent to the Court, the Town respectfully requests that its Letter-Motion to Compel be granted.

---

[9] Grumman's citation to *Bueno v. LR Credit 18, LLC*, 2017 WL 2712885, at *3-4 (E.D.N.Y. June 6, 2017) is inapposite. There, plaintiff did not support how documents filed under seal in another case were relevant, the court lacked information about the documents' contents, and releasing the documents risked de facto reopening a settled class action. *Id.* Here, the court can see for itself, based on the *Travelers* opinions, what the requested documents contain and why they are relevant.

Dated: May 13, 2025

Respectfully submitted,

*/s/ Matthew F. Prewitt*
Matthew F. Prewitt
J. Michael Showalter
Sonul Rao
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Phone:                            312-258-5500
Fax:      212.484.3900
Email:    matthew.prewitt@afslaw.com
          j.michael.showalter@afslaw.com
          sonul.rao@afslaw.com

Russell Selman (*pro hac vice*)
Duncan Weinstein (*pro hac vice*)
ARENTFOX SCHIFF LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Phone: 312.258.5500
Email:  russell.selman@afslaw.com
        duncan.weinstein@afslaw.com

*Counsel for Plaintiff*
*Town of Oyster Bay, New York*

26

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to the requirements of Local Rule 7.1(c). The length of this brief, excluding the pages or words contained in the caption, table of contents, table of authorities, signature blocks, and including footnotes, is 7,631 words.

_/s/  Matthew F. Prewitt_
Matthew F. Prewitt

_Counsel for Plaintiff Town of Oyster Bay_